(159 App. Div. 12.)

### PEOPLE v. PINDAR.

(Supreme Court, Appellate Division, Third Department. November 12, 1913.)

1. FALSE PRETENSES (§ 49*)—PROSECUTION—EVIDENCE—SUFFICIENCY.

In a prosecution for larceny, in that accused induced the prosecuting witness to indorse a worthless check and thus was enabled to cash it, evidence *held* sufficient to show that accused fraudulently misrepresented that the check was good.

[Ed. Note.—For other cases, see False Pretenses, Cent. Dig. § 62; Dec. Dig. § 49.*]

2. FALSE PRETENSES (§ 38*)—PROSECUTION—DEFENSES. ·

In a prosecution for larceny, where the indictment charged that accused stole money of the prosecuting witness, it is sufficient to support a conviction to show that accused, by false representations, induced the prosecuting witness to indorse a worthless check and then cashed it at a bank;

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

it appearing that the bank held the prosecuting witness on his indorsement.

[Ed. Note.—For other cases, see False Pretenses, Cent. Dig. §§ 50–53; Dec. Dig. § 38.*]

3. FALSE PRETENSES (§ 13*)—OFFENSES—WHAT CONSTITUTES.

Where accused fraudulently misrepresented that a check was good and thus induced the prosecuting witness to indorse it, whereupon it was cashed, though it was worthless, he is guilty of larceny, the crime falling within not only Penal Law (Consol. Laws 1909, c. 40) § 1293, declaring one who willfully, with intent to defraud, by aid of a check or draft procures money or property, is guilty of larceny, but also section 1290, par. 1, declaring that one who obtains money by false pretenses or trick shall be guilty of larceny.

[Ed. Note.—For other cases, see False Pretenses, Cent. Dig. § 17; Dec. Dig. § 13.*]

4. FALSE PRETENSES (§ 34*)—PROSECUTION—INDICTMENT.

In a prosecution for larceny, in that accused, by fraudulently misrepresenting a worthless check to be good, induced the prosecuting witness to indorse it, and thus was enabled to cash it, the indictment, though loosely drawn, held sufficient to charge a crime and to inform accused of the nature of the accusation and to enable him to prepare his defense.

[Ed. Note.—For other cases, see False Pretenses, Cent. Dig. § 46; Dec. Dig. § 34.*]

Howard, J., dissenting.

Appeal from Otsego County Court.

William D. Pindar was convicted of grand larceny, and he appeals. Affirmed.

The conviction was for grand larceny in the first degree, and the indictment was in part as follows:

### "Second Count.

"And the grand jury aforesaid, by this indictment, further accuses the said William D. Pindar of the crime of grand larceny in the first degree, committed as follows:

"That the said William D. Pindar heretofore, at the time and place mentioned in the first count of this indictment, with force and arms, divers goods, chattels and personal property, to wit, certain bank bills, lawful money of the United States, of a denomination to the grand jury unknown, of the value of one thousand two hundred dollars, the property of one George L. Talmadge, from the possession of the said George L. Talmadge, the true owner thereof, at the town of Maryland, Otsego county, New York, by the color and aid of a certain draft, check and order for the payment of money, to wit, viz.:

" 'No. 362.                                                          New York, Feb. 24, 1912.  19—.

" 'The Mutual Bank

" 'Broadway and 33rd St.

" 'Pay to the order of Mrs. Wm. M. Fleitmann ($2,000.00-100) two thousand dollars.                                          Wm. M. Fleitmann.'

"—which said check is indorsed on the back as follows:

" 'Mrs. Wm. M. Fleitmann, A. Moreska, W. D. Pindar, Geo. L. Talmadge.'

The said William D. Pindar knowing and with knowledge that the said William M. Fleitmann, the maker of said check, was not entitled to draw on the said Mutual Bank the sum specified therein, or to order the payment of the amount thereof. The said William D. Pindar, at the same time, making false and fraudulent representations to the said George L. Talmadge that he was personally acquainted with the maker of said check, and knew his financial responsibility, and knew him to be a millionaire and financially responsible in all respects, and represented the said check to be genuine and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

valid. That by means of said fraudulent representations as aforesaid, and by color and aid of said check, draft and order for payment of the money aforesaid, the said William D. Pindar willfully, wrongfully, unlawfully and feloniously, and with intent to defraud the said George L. Talmadge of his property, and of the use and benefit thereof, and to appropriate the same to the use of him, the said William D. Pindar, did take, steal and carry away the property above set forth, against the form of the statute in such case made and provided and against the peace of the people of the state of New York and their dignity."

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Rockwood & McKelvey, of Saratoga Springs, for appellant.

Orange L. Van Horne, of Cooperstown, for respondent.

SMITH, P. J. A certificate of reasonable doubt has been granted by the learned county judge who presided at the trial of this defendant. A number of questions for review are therein enumerated, most of which are very broad in their scope and altogether cover practically the entire trial as shown by the record. The case discloses the following facts:

The defendant owed one Talmadge about $777. On or about February 24, 1912, defendant's father told Talmadge that he had a telegram from defendant, and that if Talmadge would go to Albany defendant would pay him the sum owed. Defendant lived at West Davenport, Delaware county, and the next day he and the defendant's father went to Albany and there met defendant and a woman with him, whom he introduced as Mrs. Moreska. Defendant stated he was going to Schenevus and would pay Talmadge there. They spent the night in Albany, and in the morning both took the train to Schenevus, Otsego county, which is not far from West Davenport. Upon arriving there they went to the bank, and defendant stated to the cashier that he wished to cash the check set out in the indictment, stating both to him and to Talmadge that it was good and that the maker was a millionaire. The cashier told Talmadge that he would have to indorse the check, which he did after some hesitation, and the cashier thereupon gave Talmadge three certificates of deposit for $500 each and $500 in cash, which cash Talmadge then gave to defendant. Immediately afterwards Talmadge indorsed one of the certificates of deposit and received $500 in cash for it, which he paid to defendant. The next day Talmadge cashed one of the remaining two certificates at a bank in Oneonta and, pursuant to instructions from defendant, paid out of the proceeds $200 to defendant's father. Talmadge deposited the remaining cash, $300, in the Oneonta bank, and exchanged his remaining certificate of deposit for one of the Oneonta bank, thus receiving $800 out of the avails of the $2,000 check; the balance of $1,200 going to the defendant and his father. The check was not paid and Talmadge was obliged to make it good to the Schenevus bank.

The defendant's account of the circumstances attending the giving of the check was to the effect: That one Fleitmann, the alleged maker of the check, was interested in the musical or dramatic career of an actress known as Norosa Wayt and also as Moreska, with whom de-

fendant was living, and had promised to assist her financially. That on one occasion, when Fleitmann was calling upon her, defendant urged him to give her $5,000 to assist her in a vaudeville venture. That Fleitmann demurred, but that defendant insisted and produced blank checks, and that finally Fleitmann authorized the defendant to draw and sign with Fleitmann's name four checks on the Mutual National Bank in New York City in the amounts respectively of $100, $400, $2,000, and $2,500; the third check mentioned being the one described in the indictment. That said checks were all payable by name to Fleitmann's wife, but that Fleitmann gave Moreska authority to indorse his wife's name thereto. That Fleitmann stated at the time that he did not have any account at this bank, but would deposit early Monday morning, it then being Saturday, and that the checks would be paid all right. Fleitmann was a witness for the prosecution at the trial and denied knowing any one by the name of Moreska. He also denied having drawn or authorized the drawing of the check in question, although he admitted being acquainted with a woman named Norosa who had often asked him for money and to whom he had given small sums of money on one or two occasions. This woman and the defendant appear to have been in straitened circumstances at and prior to the giving of these checks, while Fleitmann was admittedly wealthy. Defendant had had trouble with his wife and had not been living with her for some time. On February 29th, however, a few days subsequent to the alleged giving of the checks, he went to Harrisburg, where she was living with her children, and obtained cash and certificates of deposit from two different trust companies in payment of the $400 and $2,500 checks mentioned; he being introduced by his wife in each case. Most of the proceeds of these two checks he gave to his wife to pay off a mortgage on her home, but he took about $550 back to New York with him. He never attempted to collect any one of these four checks in New York City and never presented the $100 check for collection anywhere. After returning to New York, he called up Fleitmann on the telephone and testifies that Fleitmann refused to deposit to meet the checks and has never paid them.

As regards the probable knowledge of defendant that the $2,000 check was in fact invalid and would not be paid may be noted his own testimony that soon after the cashing of the check at Schenevus, and on the same day, he said to Talmadge, "I won't swear there won't be any trouble, but if there is we will come out all right." Defendant also testified that when in Harrisburg he instructed his wife, "in case there was any trouble at all concerning those checks," to communicate with him at general delivery, New York City, under a certain assumed name. Moreover, the cashier of this Schenevus bank received a letter from him dated at New York City March 6, 1912, which reads as follows:

"I now understand that Wm. M. Fleitmann does not intend to have the checks honored which I used on the New York bank. I was just informed, this afternoon that he claims not to know anything whatsoever about them. I did not think he would dare do such a thing as he will bring about a great deal of scandal and notoriety concerning a certain young woman whom I know very well. This would prove to be most humiliating as well as un-

profitable to him. He is a very rich man and deserves to pay a much larger sum to keep things quiet.

"Miss Moreska will begin action against him soon if he does not deposit to meet the checks. In the meantime the checks should be returned to the City Bank. The chances are that he will look out for them just as he agreed too.

"I am writing Mr. Talmadge a few facts and I guess he will feel easy about the matter."

[1] There is no evidence that any civil action has been brought against Fleitmann by either Moreska or this defendant. In view of all the facts in the case, it accordingly seems clear that the jury may well have found that defendant's representation that the check was "good" was fraudulent. The defendant knew, even if the actual facts attending the giving of the four checks were as testified to by him, that there were then no funds in the bank to meet the checks. To unqualifiedly claim that one of them was "good" and thereby obtain money thereon from an indorser is sufficient to justify a finding of fraud by the jury.

[2, 3] A number of objections are raised to the judgment of conviction, among others the claim that the facts proved do not constitute the crime of larceny as charged in the indictment, on the ground that the money obtained by the defendant came from the bank and not from Talmadge. We think this claim untenable. When Talmadge was required by the bank to indorse the check, and the money and certificates were then paid to him by the bank, he thereby obtained title thereto as well as possession, as regards the bank, and at the same time guaranteed to the bank the payment of the check. His title to the entire $2,000 received was, of course, not absolute, as under the agreement had $1,200 of it was to be paid to defendant. But this payment was induced, as the jury must have found, by the fraud of defendant, and Talmadge in fact had to make good the note indorsed by him. It accordingly appears that the money obtained from him was money in which he had a special title at that time and was not then money of the bank. The indictment specifies the crime of grand larceny in the first degree, but was apparently drawn under section 1293 of the Penal Law (Consol. Laws 1909, c. 40), which reads as follows:

"Sec. 1293. Obtaining money or property by fraudulent draft.

"A person who willfully with intent to defraud, by color or aid of a check or draft, or order for the payment of money or the delivery of property, when such person knows that the drawer or maker thereof is not entitled to draw on the drawee for the sum specified therein, or to order the payment of the amount, or delivery of the property, although no express representation is made in reference thereto, obtains from another any money or property, is guilty of stealing the same and punishable accordingly."

[4] Inasmuch as defendant knew that the maker of the check had no funds or account at the bank mentioned at the time of the alleged giving of the check, we think the facts disclosed come within the provisions of the section quoted, as well as of section 1290, par. 1, which paragraph describes the old crime of obtaining goods by false pretenses as it existed prior to the passing of the Penal Code in 1881. This crime is now included under the term larceny, which also includes the crime described in section 1293. See People v. Huggins,

110 App. Div. 613, 615, 97 N. Y. Supp. 84. As to the ungrammatical and carelessly drawn parts of the indictment complained of by the defendant's counsel, it is enough to say that in our opinion the indictment as a whole, however loosely drawn, describes and charges a crime and contains sufficient averments to inform the defendant of the nature of the accusation against him and to enable him to prepare his defense. See People v. Willis, 158 N. Y. 392, 53 N. E. 29.

Without enumerating the various questions specified in certificate of reasonable doubt, we may say that we do not find any error to have been committed that may fairly be held to have prejudiced the defendant. A number of rulings by the court are for various reasons claimed to have been erroneous; but, although some of them may be open to criticism, we do not think that under all the circumstances and the evidence brought out the defendant has suffered injury thereby or has been deprived of a fair trial.

Judgment of conviction affirmed. All concur, except HOWARD, J., dissenting in memorandum.

HOWARD, J. (dissenting). I dissent and favor a reversal of this judgment because of the improper questions asked and the improper remarks made by the district attorney.